# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

November 19, 2025

Mr. Daniel J. McCoy
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

    No. 24-30170   Seville Industries v. SBA
                 USDC No. 6:22-CV-6229

Dear Mr. McCoy,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Melissa V. Mattingly, Deputy Clerk
                    504-310-7719

cc:
        Mr. Thomas F. Allen Jr.
        Ms. Vivian Hatzi Basdekis
        Mr. Adam Craig Jed
        Ms. Karen Julian King
        Mr. Thomas Peyton Smith
        Ms. Jennifer Marie Studebaker

# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 24-30170

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2025

Lyle W. Cayce
Clerk

S‎eville I‎ndustries, L.L.C.,

*Plaintiff—Appellant,*

*versus*

U‎nited S‎tates S‎mall B‎usiness A‎dministration; I‎sabella
C‎asillas G‎uzman; J‎anet Y‎ellen,

*Defendants—Appellees.*

———————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:22-CV-6229

———————————————————

Before C‎lement, O‎ldham, and W‎ilson, *Circuit Judges.*

A‎ndrew S. O‎ldham, *Circuit Judge*:

Seville Industries challenges the Small Business Administration's decision not to forgive the entirety of its PPP loan. The question presented is whether the CARES Act's definition of "payroll costs" entitles businesses to count money paid to independent contractors. It does not, so we affirm.

No. 24-30170

# I

## A

### 1

Congress enacted the Small Business Act of 1953 in Title II of a broader statute. *See* Pub. L. No. 83-163, 67 Stat. 230, 232 (1953) (codified as amended at 15 U.S.C. §§ 631 *et seq.*). In 1958, Congress turned Title II into the freestanding Small Business Act. *See* Pub. L. No. 85-536, 72 Stat. 384 (1958). The Small Business Act established the Small Business Administration ("SBA"). *See* 15 U.S.C. § 633(a). The SBA's statutory purpose is to "aid, counsel, assist, and protect insofar as is possible the interests of small-business concerns in order to preserve free competitive enterprise." *SBA v. McClellan*, 364 U.S. 446, 447 (1960) (quoting 67 Stat. at 232).

The SBA's main way of aiding small businesses is by financing and guaranteeing private loans. *See* 15 U.S.C. § 636(a). These so-called "Section 7(a) loans"—named for the provision's original location in the Small Business Act, *see* 72 Stat. at 387—are the SBA's "flagship loan program." ROBERT JAY DILGER, CONG. RSCH. SERV., R41146, SMALL BUSINESS ADMINISTRATION 7(A) LOAN GUARANTY PROGRAM 1 (2020), https://perma.cc/S22J-5LGS. Typically, the SBA "prefers to guarantee private loans rather than to disburse funds directly" to businesses. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979) (citing 15 U.S.C. § 636(a)(2)). In practice, this means the SBA guarantees a portion of a small-business loan that is issued and serviced by a private lender. If the small business defaults, then the SBA is required to "purchase its portion of the outstanding balance, upon demand" by the private lender. 13 C.F.R. § 120.2(a)(2) (2025). These "SBA-backed loans make it easier for small businesses" to "get funding by setting guidelines for loans and reducing

lender risk." *Loans*, U.S. SMALL BUS. ADMIN., https://perma.cc/T8TJ-SY3N.

The SBA also has rulemaking power. *See* 15 U.S.C. § 634(b). The Small Business Act authorizes the SBA Administrator to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this chapter." *Id.* § 634(b)(6). The Act further authorizes the Administrator to "take any and all actions . . . when he determines such actions are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans made under the provisions of this chapter." *Id.* § 634(b)(7).

2

In March 2020, "the COVID-19 pandemic ground economic activity across the country to a near standstill." *Ramey & Schwaller, LLP v. Zions Bancorporation NA*, 71 F.4th 257, 258 (5th Cir. 2023). In response, on March 27, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES Act provided trillions of dollars in emergency assistance to Americans. Among other things, it aimed "to help small businesses keep workers employed during the crisis," *Ramey & Schwaller*, 71 F.4th at 258, by providing forgivable, low-interest, federally guaranteed loans to "keep employees on the payroll," *Camelot Banquet Rooms, Inc. v. SBA*, 24 F.4th 640, 644 (7th Cir. 2022).

The CARES Act aimed to protect payrolls by creating the Paycheck Protection Program ("PPP"). *See* Pub. L. No. 116-136, §§ 1102, 1106, 134 Stat. at 286 (Title I—Keeping American Workers Paid and Employed Act). Congress "assigned [the PPP's] implementation" to the SBA. *Ramey & Schwaller*, 71 F.4th at 258. The PPP authorized the SBA to "guarantee covered loans under the same terms, conditions, and processes as a loan made

under" the usual Section 7(a) mechanism. 15 U.S.C. § 636(a)(36)(B). Two additional features of the PPP are relevant here. First, § 1102 of the CARES Act expanded the SBA's Section 7(a) loan program. *See id.* § 636(a)(36). Second, § 1106 of the CARES Act provided for the forgiveness of these government-guaranteed loans issued under the PPP.

*First*, just like regular Section 7(a) loans, "PPP loans were made by participating private lenders but guaranteed by the federal government." *Ramey & Schwaller*, 71 F.4th at 258. But unlike ordinary Section 7(a) loans, PPP loans were available not only to small businesses but also to independent contractors, sole proprietors, and other eligible self-employed individuals. *See* 15 U.S.C. § 636(a)(36)(D)(i), (ii). The PPP expanded the eligibility for a small business to include any eligible entity with 500 employees or fewer. *Compare* 13 C.F.R. § 121.301(a), *with* 15 U.S.C. § 636(a)(36)(D)(i). And it expanded the number of qualified lending institutions beyond the preexisting Section 7(a) lenders. *See id.* § 636(a)(36)(F)(iii).

The PPP allowed eligible applicants to borrow money up to a "maximum loan amount" using a formula based on its "payroll costs incurred" the previous year, in all events capped at $10 million. *Id.* § 636(a)(36)(E). That key term, "payroll costs," is statutorily defined: "[T]he term 'payroll costs' . . . means . . . the sum of payments of any compensation with respect to employees . . . and . . . the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation." *Id.* § 636(a)(36)(A)(viii). Once obtained, PPP loan proceeds could be used only for specified expenses such as payroll, mortgage interest, rent, utilities, and various employee benefits. *Id.* § 636(a)(36)(F)(i). Ultimately, the PPP made "$659 billion of government-guaranteed loans available to qualified small businesses." *In re Hidalgo Cnty. Emergency Serv. Found.*, 962 F.3d 838, 840 & n.1 (5th Cir. 2020).

*Second*, PPP loans are generally forgivable in whole or in part. *See generally* 15 U.S.C. § 636m. PPP borrowers are eligible for loan forgiveness in an amount equal to the costs they incurred on the specified expenses. *See id.* § 636m(b)(1)–(8). To secure forgiveness, PPP borrowers must specify "the number of full-time equivalent employees on payroll and pay rates" and certify that, *inter alia*, "the amount for which forgiveness is requested was used to retain employees." *Id.* § 636m(e)(1), (3).[1] But the statute limits the amount of loan forgiveness available in a few ways. *See id.* § 636m(d). For example, the amount of forgiveness cannot exceed the loan principal. *See id.* § 636m(d)(1). The amount of forgiveness is reduced proportionately with how much a PPP borrower reduced the number of employees on its payroll. *See id.* § 636m(d)(2). And the amount of forgiveness is reduced by the amount the PPP borrower cut its employees' wages beyond 25 percent. *See id.* § 636m(d)(3).

To ensure speedy administration of the PPP during the early stages of the pandemic, the CARES Act required the SBA to implement the program within 15 days of the Act's enactment. *See id.* § 9012; *see also In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (describing this timeframe as "practically warp speed for regulatory action"). To achieve that speed, Congress gave the SBA emergency rulemaking authority exempted from the usual notice-and-comment requirements of the APA. *See* 15 U.S.C. § 9012.

---

[1] Note that "payroll costs" has the same statutory definition for loan forgiveness as it does for determining the maximum loan amount in the first instance. 15 U.S.C. § 636m(a)(12) (cross-referencing *id.* § 636(a)(36)).

No. 24-30170

3

Under that emergency rulemaking authority, the SBA issued an interim final rule implementing the PPP within its 15-day deadline. *See* 85 Fed. Reg. 20811, 20811 (Apr. 15, 2020) (codified at 13 C.F.R. pt. 120) ("IFR"). The IFR was posted on the SBA and Treasury websites on April 2, 2020; was effective April 15, 2020; and applied to PPP applications through June 30, 2020, or until PPP funds were exhausted. *See ibid*. The IFR explained the PPP loan eligibility and application requirements to potential borrowers and detailed the responsibilities of private lenders under the streamlined PPP process. *Id.* at 20812–16.

Relative to the typical Section 7(a) loan process, that streamlined process simplified the lenders' underwriting obligations. *See id.* at 20815. It allowed private lenders "to rely on certifications of the borrower in order to determine eligibility" and "specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness." *Id.* at 20812. And in addition to all preexisting Section 7(a) lenders, the IFR authorized new qualified lenders to make PPP loans, including all "federally insured depository institution[s]" and "federally insured credit union[s]." *Id.* at 20815.

Given the hurry to get cash in workers' hands during those early days of the pandemic, the IFR ensured applicants were "informed o[f] how to apply for a loan and the terms of the loan . . . as soon as possible." *Id.* at 20811. The IFR explained that the maximum loan amount would be "calculate[d] using a payroll-based formula specified in the Act" as discussed above. *Id.* at 20812. It clarified that "[p]ayroll costs consist of compensation to employees" in various forms and, "for an independent contractor or sole proprietor," they consist of "wages, commissions, income, or net earnings from self-employment." *Id.* at 20813. It told applicants that independent

contractors "do not count for purposes of a borrower's PPP loan calculation" because they "have the ability to apply for a PPP loan on their own." *Ibid.* Same for loan forgiveness. *Id.* at 20814. And the IFR emphasized the CARES Act's "overarching focus on keeping workers paid and employed." *Ibid.*

The PPP's rapid implementation and reliance on self-certification in the early days of the pandemic made it a target for fraud. A July 2021 GAO report noted that the program had "limited . . . safeguards" that "resulted in improper payments and fraud risks." Gov't Accountability Off., Paycheck Protection Program: SBA Added Program Safeguards, But Additional Actions Are Needed 2 (2021), https://perma.cc/74MC-535D. Relying on its power under 15 U.S.C. § 634(b)(6), (7), and (11) to audit and investigate compliance with the Act and its regulations, the SBA launched a system of PPP loan review via interim final rule. *See* 85 Fed. Reg. 33010 (June 1, 2020). Under that system, the SBA would deny a PPP borrower's loan forgiveness application if it determined that the borrower was ineligible for the PPP loan amount in the first place. *Id.* at 33012.

B

Seville Industries, LLC is based in Abbeville, Louisiana. It provides "products, services, and work crews to businesses operating in the oil and gas sector." ROA.143. Seville employed 58 W-2 employees and 111 independent contractors when the COVID-19 pandemic started.

On April 7, 2020, Seville applied for a PPP loan from Loan Source Inc., an SBA-approved private lender. On its application, Seville stated that it had 53 employees and an average monthly payroll of $1,271,193. This

apparently yielded a loan amount of $2,578,351.[2] The payroll calculation on Seville's application included compensation it paid to independent contractors, whom it did not count among its "employees." Two days later, the SBA approved Seville's PPP application, and on April 17, Loan Source disbursed the money to Seville.

Just over a year later, in August 2021, Seville applied for full forgiveness of its PPP loan. Three days later, the SBA notified Loan Source that it was reviewing Seville's PPP loan because the maximum loan for 53 employees should have been $1,104,149—about $1.5 million less than Seville had received. It requested a copy of Seville's loan application along with supporting documentation and analysis. That September, the SBA requested additional information. After getting it in February 2022, the SBA notified Loan Source that it was considering a full denial of Seville's PPP loan forgiveness application because Seville included payments to independent contractors in its calculation of payroll costs.

On March 28, 2022, the SBA issued to Seville its PPP Final SBA Loan Review Decision. The SBA determined that Seville was entitled only to partial forgiveness for the amount of the PPP loan based on money paid to employees rather than to independent contractors. The next day, the SBA reimbursed Seville $687,508.64 in principal and $13,392.29 in interest.

Seville appealed the SBA's decision to the SBA Office of Hearings and Appeals ("OHA"). The OHA denied the appeal. Seville petitioned for reconsideration, which the OHA also denied.

In December 2022, Seville timely appealed the SBA's final agency decision to the Western District of Louisiana. *See* 13 C.F.R. § 134.1211(g)

---

[2] Although not at issue in this litigation, the amount calculated for Seville's total PPP loan was incorrect in a few respects, which Seville admits.

No. 24-30170

("Final decisions may be appealed to the appropriate Federal district court only."); *Seville Indus. LLC v. U.S. Small Bus. Admin.*, No. 22-CV-06229, 2024 WL 697592, at *3 (W.D. La. Feb. 20, 2024). The district court granted summary judgment to the SBA. *Id.* at *8.

Seville timely appealed to our court. Our review is *de novo. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

## II

The question in this case is whether the CARES Act's reference to "payroll costs," 15 U.S.C. § 636(a)(36)(A)(viii), allowed Seville to borrow a federally guaranteed loan for $1.5 million at 1 percent interest on the basis of money it paid to independent contractors, spend not a single cent of it on keeping independent contractors working during the pandemic, and then have those loans forgiven on the back end. The answer is no. That conclusion is supported by (A) the statute's text and structure and (B) the statutory scheme more generally. (C) Seville's contrary reading is unpersuasive.

## A

"In matters of statutory interpretation, text is always the alpha" and "omega." *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019). Here is the operative statutory text:

No. 24-30170

The term "payroll costs"--

(I) means--

    (aa) the sum of payments of any compensation with respect to employees that is a--

        (AA) salary, wage, commission, or similar compensation;

        (BB) payment of cash tip or equivalent;

        (CC) payment for vacation, parental, family, medical, or sick leave;

        (DD) allowance for dismissal or separation;

        (EE) payment required for the provisions of group health care or group life, disability, vision, or dental insurance benefits, including insurance premiums;

        (FF) payment of any retirement benefit; or

        (GG) payment of State or local tax assessed on the compensation of employees; and

    (bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation and that is in an amount that is not more than $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred[.]

15 U.S.C. § 636(a)(36)(A)(viii).

The provision's "text and structure . . . indicate that the language preceding the em dash[] distributes throughout the statutory sentence." *United States v. Palomares*, 52 F.4th 640, 650 (5th Cir. 2022) (Oldham, J., concurring). So the phrase "the term 'payroll costs' means" distributes to

No. 24-30170

"every item on the ensuing list." *Pulsifer v. United States*, 601 U.S. 124, 134 (2024). The provision thus reads:

> (aa) [The term "payroll costs" *means*] the sum of payments of any compensation with respect to employees . . . ; *and*

> (bb) [The term "payroll costs" *means*] the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation.

15 U.S.C. § 636(a)(36)(A)(viii) (emphasis added).

The statute therefore tells us what "'payroll costs' . . . means" for businesses with employees and for independent contractors. "Means," of course, indicates a definition. *See Mean*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 1519 (2d ed. 1934; 1950) ("WEBSTER'S SECOND") ("To have in mind as the object, application, signification, or the like."). So for businesses or other organizations with a traditional payroll, subsection (aa) defines "payroll costs" as "the sum of payments of any compensation with respect to employees" such as wages, tips, leave, severance, insurance, and retirement benefits. 15 U.S.C. § 636(a)(36)(A)(viii)(aa). "[A]nd" for entities *without* traditional payrolls, such as an independent contractor or sole proprietor, subsection (bb) defines "payroll costs" as "the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation." *Id.* § 636(a)(36)(A)(viii)(bb).

Subsection (bb) therefore defines payroll costs as the money *earned by* independent contractors or sole proprietors, not as the money *paid to* them by businesses. True, "in a vacuum," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 20 (2018) (quotation omitted), a business like Seville could

No. 24-30170

read "compensation to" as a reference to its outflow payments to independent contractors. But, as the SBA urges, the phrase "compensation to or income of a sole proprietor or independent contractor" is "most naturally read as a single integrated element," Red Br. at 25, referring to all the amounts *earned by* a self-employed person. That phrase's immediate "surrounding context," *Diaz v. United States*, 602 U.S. 526, 536 (2024), confirms that interpretation: The terms "wage, commission, income, net earnings from self-employment, or similar compensation" are all ways of capturing money earned by a self-employed person, not money spent by the business who hired him. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) (explaining that "the canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated" (quotation omitted)).

Consider also the article in the phrase "*a* sole proprietor or independent contractor," and contrast that with subsection (aa)'s reference to "compensation with respect to *employees*." 15 U.S.C. § 636(a)(36)(A)(viii)(aa), (bb) (emphases added); *see also Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 151 (2017) (explaining the statutory distinction between "singular" and "plural" terms). That deliberate difference further confirms that subsection (aa) encompasses one business's payments *out* to *multiple* employees while subsection (bb) describes the eligible money coming *in* for a *single* loan applicant who is self-employed. That distinction is hard to reconcile with the reality that a business can hire many independent contractors for any number of discrete or irregular tasks, as Seville in fact did.

The ordinary meaning of "payroll costs" supports this reading too. *See Delligatti v. United States*, 145 S. Ct. 797, 808 (2025) ("When choosing among interpretations of a statutory definition, the 'ordinary meaning' of the 'defined term' is an important contextual clue." (quoting *Bond v. United States*, 572 U.S. 844, 861 (2014))). "Payroll" has consistently referred to a

business's regular employees who receive paychecks at regular intervals, not to independent contractors or others that the business may hire for a singular task or discrete set of jobs. *See, e.g.*, *Payroll*, Black's Law Dictionary (12th ed. 2024) ("The total compensation payable to a company's employees for one pay period."). *But see Independent Contractor*, Black's Law Dictionary (12th ed. 2024) ("Someone who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it."). True, subsection (bb) expands the traditional meaning of payroll costs so that self-employed individuals can also apply for paycheck protection under the CARES Act. But an emergency provision giving novel protections to self-employed individuals does not expand the ordinary meaning of payroll costs for traditionally structured businesses—a meaning reflected in the enumerated costs of subsection (aa).

B

Our interpretation of "payroll costs" comports with the rest of the CARES Act's statutory scheme. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("[T]he Court must read the words Congress enacted in their context and with a view to their place in the overall statutory scheme." (quotation omitted)). That scheme presupposes that businesses *cannot* count payments to independent contractors (or sole proprietors) as payroll costs. Thus, Seville's interpretation introduces many asymmetries and incongruities with other provisions in the CARES Act. *See Jones v. Hendrix*, 599 U.S. 465, 479 (2023) ("We generally resist attributing to Congress an intention to render a statute so internally inconsistent." (quotation omitted)). Two bear emphasis.

*First*, the statute excludes from payroll costs "compensation of an employee whose principal place of residence is outside of the United States." 15 U.S.C. § 636(a)(36)(A)(viii)(II)(cc). But the statute does not make the

same exclusion for payments to sole proprietors and independent contrac-tors. Though not impossible, it would be freakish for the statute—which was aimed at "help[ing] small businesses keep workers employed during the crisis," *Ramey & Schwaller*, 71 F.4th at 258—to exclude foreign resident employees but include foreign resident independent contractors. Seville has no explanation for that asymmetry. Instead, the commonsense reading is that the statute does not exclude payments to foreign resident independent con-tractors because it does not contemplate including payments to any inde-pendent contractors *at all*.

*Second*, the reading we adopt also squares with the conditions of the loan forgiveness program. The amount of forgiveness to which a PPP bor-rower is entitled is based on its payroll costs. *See* 15 U.S.C. § 636m(b)(1). The forgiveness provision incentivizes businesses to use at least some PPP money to keep their employees on the payroll, as opposed to using it all on mortgage interest or rent. To do so, the statute proportionately limits the amount of loan forgiveness available to a business based on its "reduction in number of employees," *id.* § 636m(d)(2), or cuts it made to the "salary or wages of any employee" beyond 25 percent, *id.* § 636m(d)(3)(A). In other words, if small businesses fired too many employees or reduced wages during the pandemic, then the amount of their PPP loans eligible for forgiveness is reduced.

But the statute provides no corresponding limitation for cuts to inde-pendent contractors. Again, Seville has no explanation for this incongruity. It would make no sense for the statute to provide PPP loans at the outset based on a business's outflows to independent contractors, but then give full forgiveness on that borrowed money even if the business fired every single independent contractor. In fact, that is what happened here. At oral argu-ment, Seville's counsel admitted that, out of the $1.5 million Seville bor-rowed based on its payments to independent contractors the previous year,

it spent precisely $0 on keeping independent contractors working during the pandemic. Oral Arg. at 11:15–30.

## C

Seville's contrary interpretation is unpersuasive. Seville accepts, as it must, that subsection (bb) authorizes independent contractors to apply for their own loans. It nevertheless maintains that money spent on independent contractors could *also* be added to a business's payroll costs along with the items listed in subsection (aa). The SBA's interpretation, it alleges, improperly reads "and" to mean "or . . . in the so-called 'distributive' sense." Blue Br. at 19. Seville therefore reads "and" to denote the arithmetical addition of subsections (aa) and (bb). Thus, Seville would rewrite § 636(a)(36)(A)(viii) to say:

> The term "payroll costs"--
>
> (I) means [*the sum of*]--
>
>   (aa) the sum of payments of any compensation with respect to employees . . . ; and
>
>   (bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor[.]

But "and" cannot bear that weight in this statute. *Cf. Palomares*, 52 F.4th at 649 (Oldham, J., concurring) ("We do the law a disservice when we suggest that textualist exegeses are reducible to . . . hyper-literalist readings of the word *and*."). That is for five reasons.

*First*, as we have explained, the most natural reading reflects that Congress chose a two-part structure that distributes the word "means" across (aa) and (bb), providing two separate definitions of "payroll costs" for two different types of applicants. For businesses with traditional payrolls, subsection (aa) tells it what kinds of outflows it can count. For self-employed individuals, subsection (bb) tells it what kind of inflows it can count.

*Second*, Seville has no theory for what the word "means" does in the statute. "Means" does not denote numerical addition; it provides a definition. A dictionary will tell you that "iris" *means* (1) the goddess of the rainbow in the *Iliad*, (2) a rainbow, (3) "a rainbowlike play of colors," (4) part of the eyeball, (5) a notable asteroid in the asteroid belt, (6) a type of flower, (7) a "color, reddish-blue in hue," (8) a type of quartz, (9) a filmmaking device, (10) a photography device, and (11) a part of a butterfly. *Iris*, Webster's Second at 1310. But that is not to say that "iris" *means* the summation, addition, or total of a goddess, a rainbow, an asteroid, a flower, a filmmaking device, a butterfly, &c. Multiple definitions instead communicate that a phrase has different meanings in different situations. So too here.

*Third*, Congress knew how to say "the sum of" in the CARES Act when it wanted to. The first example is staring us in the face: Subsections (aa) and (bb) both tell applicants to calculate "the sum of" their elements. The CARES Act is chock full of other examples. For example, look at 15 U.S.C. § 636(a)(36)(E)(i)(I). There, Congress directed that a PPP borrower's maximum loan amount be calculated as "the sum of" items (aa) (payroll costs multiplied by 2.5) and (bb) (existing disaster-relief loan balance). Similarly, the maximum loan amount for a farmer or rancher without employees is calculated as "the sum of" items (aa) (2019 monthly gross income multiplied by 2.5) and (bb) (existing disaster-relief loan balance). *Id.* § 636(a)(36)(V)(ii)(I). And Congress specified the PPP loan forgiveness amount would be calculated as the "the sum of" a list of enumerated expenses. *Id.* § 636m(b)(1)–(8). Try as it might, Seville cannot write the words "the sum of" into § 636(a)(36)(A)(viii)(I), which instead states only that "payroll costs" "means" (aa) and (bb). That omission shows borrowers are *not* supposed to sum up (aa) and (bb).

*Fourth*, if Congress wanted businesses to sum the elements of (aa) with the elements of (bb), why break subsection (I) into (aa) and (bb) at all?

To communicate that meaning, the more natural organization would have been a single list of items constituting "payroll costs"—including employee payroll and payments to independent contractors—that every applicant (whether a business or self-employed individual) could add to its sum if applicable. Such a list would not need to repeat the phrases "wage," "commission," and "similar compensation" across subsections (aa) and (bb). Nor would it cap payments to employees and independent-contractor income in two separate sections, even though the cap is the same amount. *Compare id.* § 636(a)(36)(A)(viii)(II)(aa) (capping payroll costs attributed to the "compensation of an individual employee" at $100,000), *with id.* § 636(a)(36)(A)(viii)(I)(bb) (capping payroll costs countable by self-employed applicants at $100,000). Seville's interpretation explains none of this.

*Fifth and finally*, Seville's reading creates a "double dipping" problem. *Seville Indus.*, 2024 WL 697592, at *6. No one disputes that both small businesses and independent contractors could apply for PPP loans on their own. *See* 15 U.S.C. § 636(a)(36)(D)(i), (ii). But if both applied and small businesses could count in their "payroll costs" what they paid to independent contractors, that would "permit[] small businesses and their contractors to count the same amounts twice to obtain multiple loans." *Seville Indus.*, 2024 WL 697592, at *6. There is no principled reason to think Congress meant to double count money spent on independent contractors, especially in a statute that is otherwise rigorous about avoiding duplication. *See* 15 U.S.C. § 636(a)(36)(A)(viii)(II)(dd), (ee) (excluding from payroll costs sick and family leave wages that are already entitled to tax credits); *id.* § 636(a)(36)(G)(i)(IV) (requiring PPP loan applicants to certify that they have "not received amounts under this subsection for the same purpose and duplicative of amounts" already "applied for or received").

No. 24-30170

Seville argues that § 636(a)(36)(G)(i)(IV) solves its double dipping problem because it stops a small business and an independent contractor from borrowing based on the same payments. Not so. This provision requires each applicant to certify that *it* has not received a PPP loan already, not that no one else has. But even if the provision did apply in the way Seville contends, then a small business's loan based on what it paid to independent contractors would prevent those independent contractors from getting their own loans. That would be absurd: It would mean independent contractors would get no funds at all. No interpretation could be more "illogical," *Jones*, 599 U.S. at 480, or make less sense of the CARES Act.

In short, the statutory text, structure, and context all foreclose Seville's reading of the CARES Act.

### III

We also reject Seville's two other claims.

First, Seville claims the IFR changed the meaning of "payroll costs." It did not; the term always excluded payments to independent contractors. The IFR was an interpretive rule that merely "advise[d] the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). So the SBA's decision not to forgive Seville's loan is "no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 135 (1936).

Second, Seville's equitable estoppel claim fails too. As an initial matter, Seville did not bring this claim in its complaint, so it was forfeited. Regardless, even assuming equitable estoppel *could* run against the Government, *see Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984) (leaving the issue open); *Knapp v. U.S. Dep't of Agric.*, 796 F.3d

No. 24-30170

445, 461 (5th Cir. 2015) (same), "claims for estoppel" against the Government "cannot be entertained where public money is at stake," *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990). But even if it could bring an equitable estoppel claim, Seville has not come close to showing "affirmative misconduct by the [G]overnment." *Knapp*, 796 F.3d at 461. Rather, it just disagrees (incorrectly) with the SBA about the meaning of "payroll costs." And it is far from clear that receiving a $1.5 million loan at 1 percent interest—far more than Seville was even entitled to—is a "substantial injury." *Ibid.*

In any event, the notion that Seville had the rug pulled from under it is untenable. Consider Seville's PPP application form. It asked Seville to provide its average monthly payroll and number of employees, and it required Seville to "certify in good faith" that it would "verify[] the number of full-time equivalent employees" on its "payroll." ROA.605. It required Seville to certify that it "underst[oo]d that loan forgiveness w[ould] be provided for the sum of documented payroll costs." *Ibid.* The form's instructions listed what expenses could be included in payroll costs, and it provided a different list "for an independent contractor or sole proprietor." ROA.606. Nowhere did this form indicate that Seville could count what it paid to independent contractors.

\*      \*      \*

A careful, commonsense reading of the CARES Act shows that Congress's design for the PPP was clear: "Payroll costs" do not include payments that small businesses made to independent contractors. The statute made low-interest loans available during the pandemic for small businesses to maintain their payrolls and for independent contractors to make up lost income. On the front end, Seville improperly counted its payments to

No. 24-30170

independent contractors and borrowed too much money. Come forgiveness season, only the loans based on genuine payroll costs shall be redeemed.

AFFIRMED.

# United States Court of Appeals
# for the Fifth Circuit

**Certified as a true copy and issued as the mandate on Nov 19, 2025**

Attest: *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

—————————

No. 24-30170

—————————

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2025

Lyle W. Cayce
Clerk

SEVILLE INDUSTRIES, L.L.C.,

*Plaintiff—Appellant,*

*versus*

UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABELLA CASILLAS GUZMAN; JANET YELLEN,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:22-CV-6229

————————————————————

Before CLEMENT, OLDHAM, and WILSON, *Circuit Judges*.

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that each party to bear their own costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See Fed. R. App. P. 41(b). The court may shorten or extend the time by order. See 5th Cir. R. 41 I.O.P.